UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| JOSE GONSALEZ, § § Plaintiff, § § v. § § TEXAS DEPARTMENT OF CRIMINAL § JUSTICE; BOBBY LUMPKIN; WARDEN § JAMES BOWMAN; OFFICER RICKY § MINTON; and OFFICER FNU COUSINS, § § Defendants. § | CAUSE OF ACTION: JURY TRIAL REQUESTED Civil Action No. 4:21-cv-2777 |

**PLAINTIFF'S ORIGINAL COMPLAINT**

Plaintiff Jose Gonzalez brings this case against the Texas Department of Criminal Justice for negligence and against Bobby Lumpkin, Warden James Bowman, Officer Ricky Minton, and Officer FNU Cousins, in their individual capacities, for violations of Plaintiff's Eighth Amendment rights.

I. PARTIES

1. Plaintiff Jose Gonzalez is a resident of Tarrant County, Texas. Gonzalez was incarcerated during the events at issue in this case, but he is no longer incarcerated.

2. Defendant Bobby Lumpkin was the senior TDCJ official at the Texas Department of Criminal Justice Manufacturing, Agribusiness and Logistics Division at the relevant time in 2019. He can be served with process at 2 Financial Plaza, Huntsville, TX 77340. At all relevant times, Defendant Bowman was acting under color of law as an executive official of TDCJ. *Service is hereby requested at this time.*

3. Defendant Texas Department of Criminal Justice (TDCJ) is a governmental unit that may be served with process by serving Bryan Collier, its Executive Director, at 861-B I-45 N.,

Huntsville, TX 77320. TDCJ owns and operates the TDCJ Powledge Unit, and the device therein that caused catastrophic injuries to Gonzalez. *Service is hereby requested at this time.*

4.   Defendant Warden James Bowman is a TDCJ officer that supervised the officers and inmates working in the Powledge Unit's metal fabrication plant. He can be served with process at the Powledge Unit at 1400 FM 3452, Palestine, Texas 7580. Defendant Bowman is sued in his individual capacity for compensatory and punitive damages. At all relevant times, Defendant Bowman was acting under color of law as an TDCJ Correctional Officer. *Service is hereby requested at this time.*

5.   Defendant Officer Ricky Minton is a TDCJ officer that was the Metal fabrication plant Manager and supervised officers and inmates working in the metal fabrication plant. He can be served with process at the Powledge Unit at 1400 FM 3452, Palestine, Texas 7580. Defendant Bowman is sued in his individual capacity for compensatory and punitive damages. At all relevant times, Defendant Bowman was acting under color of law as an TDCJ Correctional Officer. *Service is hereby requested at this time.*

6.   Defendant Officer Cousins is a TDCJ officer that was the Metal Fabrication Director and supervised the officers and inmates working in the metal fabrication plant. He can be served with process at the Powledge Unit at 1400 FM 3452, Palestine, Texas 7580. Defendant Bowman is sued in his individual capacity for compensatory and punitive damages. At all relevant times, Defendant Bowman was acting under color of law as an TDCJ Correctional Officer. *Service is hereby requested at this time.*

## II. JURISDICTION AND VENUE

7. This Court has federal question jurisdiction over this 42 U.S.C. § 1983 action pursuant to 28 U.S.C. §§ 1331 and 1343. This Court has supplemental jurisdiction over the pendant state law claims pursuant to 28 U.S.C. § 1367 as the claims are based upon the same case or controversy.

8. Venue is proper in this Court, pursuant to 28 U.S.C. § 1391(b)(1), as TDCJ's headquarters where Lumpkin implemented and then failed to correct the policy at issue is located in this division and district. Moreover, TDCJ itself is also located in this division and district.

## III. FACTS

9. During his incarceration in Texas Department of Criminal Justice prisons, Plaintiff Jose Gonzalez worked cleaning the metal fabrication plant at the Powledge Unit, where he was severely injured due to the dangerous state of a machine there that was well-known to both unit-level staff and executives at TDCJ.

**A. TDCJ's compulsory labor force and profits**

10. TDCJ is the state agency responsible for incarcerating people who are sentenced for more than one year of imprisonment.

11. One subdivision of TDCJ is the Texas Correctional Industries, a consumer-facing, government-run business that supplies goods and services to other government agencies.

12. TDCJ collects millions of dollars in revenue each year from Texas Correctional Industries. During fiscal year 2019, the TCI's for-profit goods and services made $73.8 million, with its profits appropriated back to TDCJ. In 2015, TCI's typical yearly profit was over 69% of its gross revenue per fiscal year.

13. Texas Correctional Industries "employs" countless TDCJ inmates to perform both skilled and unskilled labor, for a "wage" of $0.

14. As a result of its access to free labor, TCI's products are typically cheaper than their competitors' equivalent products, undercutting private vendors who would otherwise sell to TDCJ and other government agencies.

15. TCI sells a wide variety of metal products including water tanks, truck beds, traffic control signs, bleachers, chain link fences, benches, lockers, shelves, grab bars, toilets, tables, storage boxes, picnic tables, trash cans, smokers, grills, and even modular prison cells.

16. Particularly, at the Powledge Unit, the metal fabrication shop produces traffic signs.

17. An inmate who refuses a work assignment in TDCJ is often punished in multiple ways:

   a. Forbidden from participating in any programs such as educational programs;

   b. Forbidden from participating in recreational activity;

   c. Forbidden from earning "good conduct time credits," which can decrease the length of their incarceration;

   d. Forbidden from earning "diligent participation credits," which can further decrease the length of their incarceration; and

   e. Charged with and convicted of a disciplinary violation, whose punishments can escalate from the loss of myriad privileges such as access to any personal property or the television, to forfeiture of previously earned "good conduct time," to ultimately restricting the inmate to their cell.

18. Thus, inmates who are told to report for work must do so, and they must obey all instructions at their work assignment, on pain of lengthening their incarceration, being stripped of the very few freedoms Texas prisoners enjoy, and being reduced to near-solitary confinement conditions.

19. Texas Corrections Industries is in turn a subsidiary of TDCJ's Manufacturing, Agribusiness and Logistic Division.

20. From 2013 through 2020, Lumpkin was the director of that division.

21. Thus, Lumpkin was responsible for submitting proposed policies governing his division for final approval by TDCJ's executive director. He was also responsible for proposing and managing his division's budget and expenditures, and supervising the conduct of subordinates in his division.

**B.  Dangerous Conditions at the Powledge metal fabrication plant**

22. At the Powledge Unit prison, Plaintiff Gonzalez was often required to work cleaning metal fabrication plant machines that were poorly maintained and dangerously constructed.

23. TDCJ and Defendants Bowman, Minton, and Cousins actually knew that the machines in the metal fabrication plant, and particularly the auger at issue in this case, were dangerously constructed and poorly maintained.

24. One of the machines that Defendants forced Gonzalez to work with was the auger retrieval system, also known as an abrasive media or abrasive blast screw conveyor recovery system. The relevant metal fabricating area was used to blast abrasive particulates to polish and clean metal surfaces. The auger consisted of a large spinning screw in the middle of the floor, which directed used particulates and other metal debris back to a conveyor so they could be easily disposed of or reused.

25. Typically, commercially-made augers are built into the floor and covered with a mesh or a grate so that people and their limbs are not pulled into the large screw system. Commercially-available augers are also usually tied to a kill switch and have safety features that prevent the screw from exerting a dangerous amount of force which could seriously injure a worker.

26. However, using free labor is not the only way TCI cuts costs, at Lumpkin's direction, compared to its private competitors.

27. To save money, Lumpkin, TDCJ and Defendants Bowman, Minton, and Cousins had unqualified TDCJ inmates design, construct, maintain, and attempt repairs of many of the machines in the metal fabrication plant, rather than buying commercially available machines and having them assembled properly with all of their appropriate safety mechanisms.

28. Defendant Minton specifically directed the design and construction of the auger machine by a TDCJ inmate. Minton specifically failed to supervise inmates to make sure the auger included proper safeguards, had integral safety components, was operating as intended, and was not in need of repairs.

29. Instead, on information and belief, Minton required that the inmates omit appropriate safeguards and integral safety components from the auger to further reduce costs. Minton ordered that the auger be built on top of a shallow depression in the floor, rather than be housed in a deeper channel completely beneath the level of the floor, and that the spinning screw not be covered by a grate to protect people from the spinning screw.

30. As a result, the auger in the Powledge metal fabrication plant lacked appropriate kill switches to turn the machine off in an emergency, proper safety guards to ensure people are not pulled into the machine, automatic kill switches that detect if an object or person is caught in the auger, or covers over dangerous elements – including the spinning auger itself – to ensure the machine could not accidentally be turned on or pull people in.

31. TDCJ routinely received inmate reports of safety hazards at the metal fabrication plant.

32. TDCJ employees, including both Bowman personally and numerous other employees, also routinely inspected the safety hazards at the metal fabrication plant and observed those safety hazards.

33. These reports of injuries and hazards are funneled through TDCJ along multiple avenues, but they are ultimately compiled for the review of the relevant division director – in this case, Lumpkin – and Powledge-specific reports are similarly compiled for the warden – Bowman.

34. Thus, Bowman specifically knew of the danger from the auger at Powledge.

35. Likewise, on information and belief, Lumpkin specifically knew that Powledge, and other similar metal fabrication plants throughout TDCJ, were dangerous to inmates like Gonzalez.

36. Despite receiving these reports and knowing of these conditions, Defendants permitted the danger to continue.

37. Specifically, despite actually knowing of his division's system-wide policy of cutting costs by using in-house design and construction of dangerous equipment like the auger – including by using ill-equipped forced labor by inmates – Lumpkin knowingly failed to prevent the danger to inmates like Gonzalez. For example, on information and belief, Lumpkin never tried to implement any minimally adequate safety standards or replace dangerous equipment with industry-standard equipment that had integral safety components. As a result of Lumpkin's decisions during his tenure as director of the Manufacturing, Agribusiness and Logistics Division, inmates like Gonzalez remained in serious danger from the equipment they were ordered to use.

38. As a result of this policy, the machines in the metal fabrication plant at Powledge, including the auger in this case, were routinely missing critical components for the safety of those who work with and around the machines.

39. Indeed, Defendants Minton, Bowman, and Collins were explicitly and repeatedly told by the inmates who built the machines, maintained the machines, attempted repairs of the machines, and worked with them that the machines lacked necessary safeguards and integral safety components.

40. Likewise, on information and belief, Lumpkin was repeatedly informed of injuries and dangers from these types of machines and other hazards his division's deficient policies left in place.

41. All Defendants knew that engineering controls – such as a guard over the spinning screw, a manual kill switch, and automatic kill switches – were feasible, necessary, and integral safety components of the auger, but all of them consciously chose to continue to require inmates to use the dangerously defective device without them.

42. Despite these dangers, Defendants required Gonzalez to work with and around the auger machine most days he worked.

**C. Gonzalez was grievously, permanently injured by the Powledge auger system**

43. On or around October 14, 2019, Gonzalez was performing his work duties cleaning around the machines in the metal fabrication plant.

44. While Gonzalez was cleaning, the auger machine turned on, hooked the rubber boot Gonzalez was wearing on his left leg and pulled his leg into the machine. A commercially available machine would have had multiple safeguards, including at least a physical cover over the opening to the auger that would have prevented limbs from being pulled inside.

45. But because the Powledge Unit's machine lacked such obvious safety devices, Gonzalez's tibia and fibula were both immediately broken and crushed in the machine.

46. Gonzalez could not stop the machine from continuing to pull his leg further into the machine because there was no kill switch to turn the machine off, like there would be on a commercially available auger, and there was no automatic safeguard of any kind to stop the auger from continuing to pull Gonzalez in.

47. The machine only stopped pulling his leg further into the machine because it jammed momentarily on a bone in his leg. At this moment, Gonzalez was able to pull what was left of his leg free.

48. Despite Gonzalez's calls for help, no help came for more than 20 minutes because he was unsupervised in the metal fabrication plant and no other inmates were nearby. Gonzalez was forced to hobble on his mangled leg to get help outside of the metal fabrication plant.

49. Once he found help, Gonzalez was quickly taken to outside hospitals.

50. Gonzalez's leg was amputated below the knee by doctors on October 22, 2019.

51. Gonzalez's injuries were proximately caused by personal property, the dangerous auger machine built, owned, maintained, and operated by TDCJ at the Powledge Unit. Thus, Defendant TDCJ's actions in improperly designing, constructing, maintaining, and repairing those machines, which they knew to be dangerous, were a proximate cause of Gonzalez's injuries.

52. Gonzalez's injuries were also proximately caused by Defendants' decision to require inmates to continue to use and work around machines they knew were dangerous. Defendants specifically knew that they had decided to omit necessary, integral safety components that would have protected inmates, including Gonzalez, from a substantial risk of serious harm from the auger.

## IV. CAUSES OF ACTION

### A. TEXAS TORT CLAIMS ACT – NEGLIGENCE
*as to the Texas Department of Criminal Justice only*

53. Defendant Texas Department of Criminal Justice (TDCJ)'s actions are subject to waivers of immunity enumerated in the Texas Tort Claims Act, Texas Civil Practice and Remedies Code § 101.021(1) & (2).

54. Defendant TDCJ is a governmental unit subject to the Texas Tort Claims Act, Texas Civil Practice and Remedies Code § 101.021.

55. The auger that injured Plaintiff was known to TDCJ to be dangerous to people using and to people who had to work around it, like the Plaintiff.

56. The auger that injured Plaintiff was tangible personal property owned by TDCJ. Likewise, the auger that injured Plaintiff was motor-driven equipment owned and used by TDCJ employees and by TDCJ inmates acting at the direction of TDCJ.

57. TDCJ's use, through one or more agents or employees, of personal property and motor-driven equipment – the auger – proximately and directly caused Plaintiff's personal injuries.

58. Moreover, the auger was unreasonably dangerous, defective, inadequate, and lacked one or more integral safety components which directly caused Plaintiff's injuries. Specifically, it lacked a physical cover over the dangerous spinning screw itself, and lacked any kind of manual or automatic kill switch that could mitigate an emergency like this situation.

59. The condition of the metal fabrication plant, including the requirement that inmates actively use and work around the dangerous auger, proximately caused Plaintiff's personal injuries.

60. Defendant TDCJ, its employees, and its agents owed Plaintiff a duty to safely maintain and use the auger without causing an injury to Plaintiff.

61. Defendant TDCJ was actually aware that the dangerously defective or broken machine posed a safety hazard to people in Plaintiff's position.

62. Defendant TDCJ and its employees breached the duty owed to Plaintiff by failing to maintain or fix the auger and subjecting inmates to the dangerous auger.

63. No exceptions to TDCJ's waivers of immunity apply. If TDCJ's employees and agents were private persons, they would be liable to Plaintiff under Texas law.

64. Plaintiff provided notice to the TDCJ of his claims as required by the Texas Tort Claims Act, and satisfied any other conditions precedent. Moreover, TDCJ was notified immediately of Plaintiff's injury and that it was caused due to the negligent use and maintenance of a TDCJ machine.

### B.  42 U.S.C. § 1983 – EIGHTH AMENDMENT
*As to Defendants Bowman, Minton, Cousins, and Lumpkin*

65. By forcing Gonzalez to work in a metal fabrication plant with dangerous and poorly constructed equipment, despite knowing of that danger, Defendants Bowman, Minton, and Cousins subjected Gonzalez to a dangerous condition of confinement and acted with deliberate indifference to an unreasonable risk of serious injury to Gonzalez.

66. By failing to adopt any policy to mitigate this extreme danger to inmate laborers, in the pursuit of profit for the agency, Lumpkin established or maintained conditions of confinement that he knew would endanger inmates like Gonzalez. This decision was likewise made with deliberate indifference to an unreasonable risk of serious injury to Gonzalez and countless other inmates in TDCJ.

67. Defendants Bowman, Minton, Cousins, and Lumpkin were subjectively aware of the dangerous conditions of confinement, and knew that they could severely injure inmates, but did nothing to protect Plaintiff or other inmates from this danger. As a direct result, the auger remained in place, as dangerous as ever, and Gonzalez was required to work with that danger on a regular basis, leading to the instant, debilitating injury. Thus, Bowman, Minton, Cousins, and Lumpkin's deliberate indifference proximately caused Gonzalez's injuries.

68. This federal claim is brought against Bowman, Minton, Cousins, and Lumpkin in their individual capacities only pursuant to 42 U.S.C. § 1983.

## V. DAMAGES

69. Plaintiff Gonzalez seeks the following damages:

   a. Past and future medical expenses;

   b. Past and future economic damages, including (but not limited to) loss of earning capacity;

   c. Past and future physical pain and mental anguish;

   d. Past and future impairment;

   e. Past and future disfigurement; and,

   f. Attorneys' fees pursuant to 42 U.S.C. § 1988.

## VI. JURY DEMAND

70. Plaintiff demands trial by jury, and has paid the jury fee.

## VII. PRAYER FOR RELIEF

71. To right this injustice, Plaintiff requests the Court:

   a. Award compensatory damages against all Defendants, and punitive damages against the individual Defendants, including Lumpkin, Warden Bowman, Officer Minton, and Officer Cousins;

    b. Award Plaintiff costs and fees, including but not limited to expert fees and attorneys' fees, pursuant to 42 U.S.C. § 1988;

    c. Award pre-judgment and post-judgment interest at the highest rate allowable under the law; and,

    d. Award and grant such other just relief as the Court deems proper.

Dated: August 24, 2021.

                                                          Respectfully submitted,

                                                          **EDWARDS LAW**
                                                          1101 East 11th Street
                                                          Tel.  512-623-7727
                                                          Fax.  512-623-7729

                                                      By  /s/ Jeff Edwards
                                                          JEFF EDWARDS
                                                          State Bar No. 24014406
                                                          jeff@edwards-law.com
                                                          SCOTT MEDLOCK
                                                          State Bar No. 24044783
                                                          S.D. ID No. 608457
                                                          scott@edwards-law.com
                                                          David James
                                                          State Bar No. 24092572
                                                          S.D. ID No. 2496580
                                                          david@edwards-law.com

                                                         **ATTORNEYS FOR PLAINTIFF**