UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | | |
|---|---|---|
| JOSE GONZALEZ, | § | |
| | § | |
| Plaintiff, | § | |
| | § | CAUSE OF ACTION: |
| v. | § | |
| | § | JURY TRIAL REQUESTED |
| BOBBY LUMPKIN; WARDEN JAMES | § | |
| BOWMAN; RICHARD MINTON; | § | Civil Action No. 6:21-cv-00351 |
| ROBERT COUSINS; CHRISTOPHER | § | |
| JAYNES; CECIL HASTINGS; and | § | |
| OFFICER PATRICK SHUMATE, | § | |
| | § | |
| Defendants. | § | |

## PLAINTIFF'S AMENDED COMPLAINT

Plaintiff Jose Gonzalez brings this case against Bobby Lumpkin, Warden James Bowman, Richard Minton, Robert Cousins, Christopher Jaynes, Cecil Hastings, and Officer Patrick Shumate in their individual capacities, for violations of Plaintiff's Eighth Amendment rights.

### I.   PARTIES

1.   Plaintiff Jose Gonzalez is a resident of Tarrant County, Texas. Gonzalez was incarcerated during the events at issue in this case, but he is no longer incarcerated.

2.   Defendant Bobby Lumpkin was the senior TDCJ official at the Texas Department of Criminal Justice Manufacturing, Agribusiness and Logistics Division at the relevant time in 2019. At all relevant times, Defendant Bowman was acting under color of law as an executive official of TDCJ. Defendant Lumpkin is sued in his individual capacity for compensatory and punitive damages. Defendant Lumpkin has been served and has appeared in this action.

3.   Defendant Warden James Bowman is a TDCJ official that supervised the officers, other staff, and inmates working in the Powledge Unit's metal fabrication plant. Defendant Bowman is

sued in his individual capacity for compensatory and punitive damages. At all relevant times, Defendant Bowman was acting under color of law as an TDCJ Correctional Officer. Defendant Bowman has been served and has appeared in this action.

4.   Defendant Richard Minton or in the alternative Ricky Minton is a TDCJ official that was the metal fabrication plant manager and supervised staff and inmates working in the metal fabrication plant. Defendant Minton is sued in his individual capacity for compensatory and punitive damages. At all relevant times, Defendant Minton was acting under color of law as an TDCJ official. Defendant Minton has been served and has appeared in this action.[1]

5.   Defendant Robert Cousins is a TDCJ official that was the Metal Fabrication Director and supervised the officers and inmates working in the metal fabrication plant. Defendant Cousins is sued in his individual capacity for compensatory and punitive damages. At all relevant times, Defendant Cousins was acting under color of law as an TDCJ official. Defendant Cousins has been served and has appeared in this action.

6.   Defendant Christopher Jaynes is a TDCJ official that was supervisor of sand blasting and metal forming in the metal fabrication plant at the time of the incident. Defendant Jaynes is sued in his individual capacity for compensatory and punitive damages. At all relevant times, Defendant Jaynes was acting under color of law as an TDCJ official. *Service is hereby requested*.

7.   Defendant Cecil Hastings is a TDCJ official that was an assistant metal fabrication plant manager, second in command overseeing the entire department. Defendant Hastings is sued in

---

[1] Plaintiff served two different Mr. Mintons who worked at the prison at the relevant time: one named Richard Minton and one named Ricky Minton. Plaintiff specifically intends to sue only the Mr. Minton who was the manager of the metal fabrication plant at the prison in October 2019. Plaintiff believes, based on information and belief, that the correct individual is Richard Minton.

his individual capacity for compensatory and punitive damages. At all relevant times, Defendant Hastings was acting under color of law as an TDCJ official. *Service is hereby requested*.

8.  On information and belief, Defendant Patrick Shumate is a TDCJ officer that oversaw safety and security in the metal fabrication plant. Defendant Shumate is sued in his individual capacity for compensatory and punitive damages. At all relevant times, Defendant Shumate was acting under color of law as an TDCJ Correctional Officer. *Service is hereby requested*.

## II.   JURISDICTION AND VENUE

9.  This Court has federal question jurisdiction over this 42 U.S.C. § 1983 action pursuant to 28 U.S.C. §§ 1331 and 1343.

10. Venue is proper in this Court and division, pursuant to 28 U.S.C. § 1391(b)(1), as the acts and omissions at issue took place in this division.

## III.   FACTS

11. During his incarceration in Texas Department of Criminal Justice prisons, Plaintiff Jose Gonzalez worked cleaning the metal fabrication plant at the Powledge Unit, where he was severely injured due to the dangerous state of a machine there that was well-known to both unit-level staff and executives at TDCJ.

### A.  TDCJ's compulsory labor force and profits

12. TDCJ is the state agency responsible for incarcerating people who are sentenced for more than one year of imprisonment.

13. One subdivision of TDCJ is the Texas Correctional Industries, a consumer-facing, government-run business that supplies goods and services to other government agencies.

14. TDCJ collects millions of dollars in revenue each year from Texas Correctional Industries. During fiscal year 2019, the TCI's for-profit goods and services made $73.8 million, with its profits

appropriated back to TDCJ. In 2015, TCI's typical yearly profit was over 69% of its gross revenue per fiscal year.

15. Texas Correctional Industries "employs" countless TDCJ inmates to perform both skilled and unskilled labor, for a "wage" of $0.

16. As a result of its access to free labor, TCI's products are typically cheaper than their competitors' equivalent products, undercutting private vendors who would otherwise sell to TDCJ and other government agencies.

17. TCI sells a wide variety of metal products including water tanks, truck beds, traffic control signs, bleachers, chain link fences, benches, lockers, shelves, grab bars, toilets, tables, storage boxes, picnic tables, trash cans, smokers, grills, and even modular prison cells.

18. Particularly, at the Powledge Unit, the metal fabrication shop produces traffic signs.

19. An inmate who refuses a work assignment in TDCJ is often punished in multiple ways:

    a.  Forbidden from participating in any programs such as educational programs;

    b.  Forbidden from participating in recreational activity;

    c.  Forbidden from earning "good conduct time credits," which can decrease the length of their incarceration;

    d.  Forbidden from earning "diligent participation credits," which can further decrease the length of their incarceration; and

    e.  Charged with and convicted of a disciplinary violation, whose punishments can escalate from the loss of myriad privileges such as access to any personal property or the television, to forfeiture of previously earned "good conduct time," to ultimately restricting the inmate to their cell.

20. Thus, inmates who are told to report for work must do so, and they must obey all instructions at their work assignment, on pain of lengthening their incarceration, being stripped of the very few freedoms Texas prisoners enjoy, and being reduced to near-solitary confinement conditions.

21. Texas Corrections Industries is in turn a subsidiary of TDCJ's Manufacturing, Agribusiness and Logistic Division.

22. From 2013 through 2020, Lumpkin was the director of that division.

23. Thus, Lumpkin was responsible for submitting proposed policies governing his division for final approval by TDCJ's executive director. He was also responsible for proposing and managing his division's budget and expenditures, and supervising the conduct of subordinates in his division.

**B.  Dangerous Conditions at the Powledge metal fabrication plant**

24. At the Powledge Unit prison, Plaintiff Gonzalez was often required to work cleaning metal fabrication plant machines that were poorly maintained and dangerously constructed.

25. On information and belief, Defendants Bowman, Minton, Hastings, Jaynes, Cousins, Shumate, and many other TDCJ employees actually knew that the machines in the metal fabrication plant, and particularly the auger at issue in this case, were dangerously constructed and poorly maintained.

26. One of the machines that Defendants forced Gonzalez to work with was the auger retrieval system, also known as an abrasive media or abrasive blast screw conveyor recovery system. The relevant metal fabricating area was used to blast abrasive particulates to polish and clean metal surfaces. The auger consisted of a large spinning screw in the middle of the floor, which directed

used particulates and other metal debris back to a conveyor so they could be easily disposed of or reused.

27. Typically, commercially-made augers are built into the floor and covered with a mesh or a grate so that people and their limbs are not pulled into the large screw system. Commercially-available augers are also usually tied to a kill switch and have safety features that prevent the screw from exerting a dangerous amount of force which could seriously injure a worker.

28. However, using free labor is not the only way TCI cuts costs, at Lumpkin's direction, compared to its private competitors.

29. To save money, Lumpkin, Bowman, Minton, Cousins, Jaynes, Shumate, and Hastings had unqualified TDCJ inmates design, construct, maintain, and attempt repairs of many of the machines in the metal fabrication plant, rather than buying commercially available machines and having them assembled properly with all of their appropriate safety mechanisms.

30. Defendant Minton and Hastings specifically directed the design and construction of the auger machine by a TDCJ inmate. Minton and Hastings specifically failed to supervise inmates to make sure the auger included proper safeguards, had integral safety components, was operating as intended, and was not in need of repairs.

31. Minton and Hastings knew that the inmates had never made an auger machine before and did not have the required expertise to do so safety.

32. Instead, on information and belief, Minton, Hastings, and Jaynes required that the inmates omit appropriate safeguards and integral safety components from the auger to further reduce costs. Minton, Hastings, and Jaynes ordered or approved constructing and operating the auger without completely shielding the spinning screw and the axel connecting it to the device's motor, such as with a grate and housing, to protect people from the spinning screw. The point where the axel

6

connected to the transmission was particularly dangerous because the coupling between the two used oversized bolts. Minton, Hastings, and Jaynes also approved and/or required the inmates to build the auger on top of the existing floor rather than creating a channel, so that the spinning axel and blade were at foot or ankle height rather than completely beneath the level of the floor.

33. As a result, the auger in the Powledge metal fabrication plant lacked appropriate kill switches to turn the machine off in an emergency, proper safety guards to ensure people are not pulled into the machine, automatic kill switches that detect if an object or person is caught in the auger, or covers over dangerous elements – including the long bolts at the transmission coupling, the spinning auger itself, and the axel – to ensure the machine could not accidentally be turned on or pull people in. The machine was also installed at a height where inmates would have to walk next to it (including the dangerously exposed spinning elements), rather than under the floor unlike a typical retrieval system.

34. TDCJ routinely received inmate reports of safety hazards at the metal fabrication plant.

35. TDCJ employees, including Bowman, Jaynes, Shumate, and numerous other employees, also routinely personally inspected the safety hazards at the metal fabrication plant and observed those safety hazards.

36. These reports of injuries and hazards are funneled through TDCJ along multiple avenues, but they are ultimately compiled for the review of the relevant division director – in this case, Lumpkin – and Powledge-specific reports are similarly compiled for the warden – Bowman.

37. On information and belief, Shumate and Jaynes were both responsible for submitting reports to Bowman about the dangers of the auger under TDCJ policy, as they were responsible for inspecting the sandblasting area. Since they were aware of the danger, Hastings and Minton also should have reported the danger to Bowman.

38. Thus, Bowman specifically knew of the danger from the auger at Powledge.

39. In the alternative, Hastings, Minton, Shumate, and Jaynes intentionally did not report the danger of the auger, despite their knowledge of the danger, as a result of their deliberate indifference to the danger to inmates like Plaintiff, in order to hide it from Bowman.

40. Likewise, on information and belief, Lumpkin specifically knew that Powledge, and other similar metal fabrication plants throughout TDCJ, were dangerous to inmates like Gonzalez.

41. Despite receiving these reports and knowing of these conditions, Defendants permitted the danger to continue.

42. Specifically, despite actually knowing of his division's system-wide policy of cutting costs by using in-house design and construction of dangerous equipment like the auger – including by using ill-equipped forced labor by inmates – Lumpkin knowingly failed to prevent the danger to inmates like Gonzalez. For example, on information and belief, Lumpkin never tried to implement any minimally adequate safety standards or replace dangerous equipment with industry-standard equipment that had integral safety components. As a result of Lumpkin's decisions during his tenure as director of the Manufacturing, Agribusiness and Logistics Division, inmates like Gonzalez remained in serious danger from the equipment they were ordered to use.

43. As a result of this policy, the machines in the metal fabrication plant at Powledge, including the auger in this case, were routinely missing critical components for the safety of those who work with and around the machines.

44. Indeed, on information and belief, Defendants Minton, Bowman, Jaynes, Shumate, Hastings, and Collins were explicitly and repeatedly told by other staff or by the inmates who built the machines, maintained the machines, attempted repairs of the machines, and/or worked with them that the machines lacked necessary safeguards and integral safety components.

8

45. Likewise, on information and belief, Lumpkin was repeatedly informed of injuries and dangers from these types of machines and other hazards his division's deficient policies left in place.

46. All Defendants knew that engineering controls – such as a guard over the bolts, spinning screw, and axel; installation below the floor; a manual kill switch; and automatic kill switches – were feasible, necessary, and integral safety components of the auger, but all of them consciously chose to continue to require inmates to use the dangerously defective device without them.

47. Despite these dangers, Defendants required Gonzalez to work with and around the auger machine most days he worked.

**C. Gonzalez was grievously, permanently injured by the Powledge auger system**

48. On or around October 14, 2019, Gonzalez was performing his work duties cleaning around the machines in the metal fabrication plant.

49. While Gonzalez was cleaning, the auger machine turned on, hooked the rubber boot Gonzalez was wearing on his left leg and pulled his leg into the machine. A commercially available machine would have had multiple safeguards, including at least a physical cover over both the spinning component(s) that hooked onto Plaintiff as well as the opening into the auger blade, and would be installed below the floor to prevent people from walking next to it.

50. On information and belief, Plaintiff's limb was initially caught by the long bolts, then pulled closer and into the auger itself because of the lack of these safeguards.

51. But because the Powledge Unit's machine lacked such obvious safety devices, Gonzalez's tibia and fibula were both immediately broken and crushed in the machine.

52. Gonzalez could not stop the machine from continuing to pull his leg further into the machine because there was no kill switch to turn the machine off, like there would be on a

commercially available auger, and there was no automatic safeguard of any kind to stop the auger from continuing to pull Gonzalez in.

53. The machine only stopped pulling his leg further into the machine because it jammed momentarily on a bone in his leg. At this moment, Gonzalez was able to pull what was left of his leg free.

54. Despite Gonzalez's calls for help, no help came for more than 20 minutes because he was unsupervised in the metal fabrication plant and no other inmates were nearby. Gonzalez was forced to hobble on his mangled leg to get help outside of the metal fabrication plant.

55. Once he found help, Gonzalez was quickly taken to outside hospitals.

56. Gonzalez's leg was amputated below the knee by doctors on October 22, 2019.

57. Gonzalez's injuries were proximately caused by personal property, the dangerous auger machine built, maintained, and operated at Defendants' direction at the Powledge Unit. Thus, Defendants' actions in improperly designing, constructing, maintaining, and repairing those machines, which they knew to be dangerous, were a proximate cause of Gonzalez's injuries.

58. Gonzalez's injuries were also proximately caused by Defendants' decision to require inmates to continue to use and work around machines they knew were dangerous. Defendants specifically knew that they had decided to omit necessary, integral safety components that would have protected inmates, including Gonzalez, from a substantial risk of serious harm from the auger.

**IV.   CAUSES OF ACTION: 42 U.S.C. § 1983 – Eighth Amendment**

59. By forcing Gonzalez to work in a metal fabrication plant with dangerous and poorly constructed equipment, despite knowing of that danger, Defendants Lumpkin, Bowman, Minton, Cousins, Jaynes, Shumate, and Hastings subjected Gonzalez to a dangerous condition of

confinement and acted with deliberate indifference to an unreasonable risk of serious injury to Gonzalez.

60. By failing to adopt any policy to mitigate this extreme danger to inmate laborers, in the pursuit of profit for the agency, Lumpkin established or maintained conditions of confinement that he knew would endanger inmates like Gonzalez. This decision was likewise made with deliberate indifference to an unreasonable risk of serious injury to Gonzalez and countless other inmates in TDCJ.

61. Defendants Lumpkin, Bowman, Minton, Cousins, Jaynes, Shumate, and Hastings were subjectively aware of the dangerous conditions of confinement, and knew that they could severely injure inmates, but did nothing to protect Plaintiff or other inmates from this danger. As a direct result, the auger remained in place, as dangerous as ever, and Gonzalez was required to work with that danger on a regular basis, leading to the instant, debilitating injury. Thus, Lumpkin, Bowman, Minton, Cousins, Jaynes, Shumate, and Hastings's deliberate indifference proximately caused Gonzalez's injuries.

62. This federal claim is brought against Lumpkin, Bowman, Minton, Cousins, Jaynes, Shumate, and Hastings in their individual capacities only pursuant to 42 U.S.C. § 1983.

### V.    DAMAGES

63. Plaintiff Gonzalez seeks the following damages:

    a.   Past and future medical expenses;

    b.   Past and future economic damages, including (but not limited to) loss of earning capacity;

    c.   Past and future physical pain and mental anguish;

    d.   Past and future impairment;

    e.   Past and future disfigurement; and,

f.   Attorneys' fees pursuant to 42 U.S.C. § 1988.

## VI. JURY DEMAND

64. Plaintiff demands trial by jury, and has paid the jury fee.

## VII.   PRAYER FOR RELIEF

65. To right this injustice, Plaintiff requests the Court:

a.   Award compensatory and punitive damages;

b.   Award Plaintiff costs and fees, including but not limited to expert fees and attorneys' fees, pursuant to 42 U.S.C. § 1988;

c.   Award pre-judgment and post-judgment interest at the highest rate allowable under the law; and,

d.   Award and grant such other just relief as the Court deems proper.

Dated: October 8, 2021.

Respectfully submitted,

**EDWARDS LAW**
1101 East 11th Street
Tel.  512-623-7727
Fax.  512-623-7729

By____/s/ Jeff Edwards_____
JEFF EDWARDS
State Bar No. 24014406
jeff@edwards-law.com
David James
State Bar No. 24092572
david@edwards-law.com

**ATTORNEYS FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

By my signature below, I certify that a true and correct copy of the foregoing has been served on all counsel of record through the Electronic Case Filing System of the Eastern District of Texas.

_____/s/ *Jeff Edwards*_____
Jeff Edwards